IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LENA IRENE HALL, | ) | Case No. 1:22-cv-964 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

Plaintiff, Lena Irene Hall, seeks judicial review of the final decision of the Commissioner of Social Security, denying her applications for disabled widow's benefits ("DWB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act.  Hall challenges the Administrative Law Judge's ("ALJ") negative findings, arguing that the ALJ failed to apply proper legal standards in the evaluation of the treating source opinions of Pamela Lancaster, DO.  Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Hall's applications for DIB and SSI must be affirmed.

## I.     Procedural History

On December 2, 2016, Hall reapplied for DWB and SSI.[1]  (Tr. 362, 369).[2]  Hall alleged

that she became disabled on March 23, 1999, due to: (i) partial complex seizures; (ii) migraines;

(iii) stroke; (iv) diabetes; (v) memory loss; (vi) pulmonary issues, including coughing and

breathing difficulties; (vii) hyperlipidemia; (viii) depression; and (ix) anxiety.  *See* (Tr. 362, 370,

420).  The Social Security Administration denied Hall's applications initially and upon

reconsideration.  (Tr. 113–46, 149–81).  ALJ Traci Hixson heard Hall's case on December 4,

2018 and issued a partially favorable decision on May 8, 2019, granting her SSI application but

denying her DWB application.  (Tr. 77–112, 184–203).  On August 20, 2020, the Appeals

Council vacated the ALJ's decision and remanded for further proceedings.  (Tr. 212–17).

On December 10, 2020, ALJ Hixson heard Hall's case on remand via telephone and

issued a partially favorable decision on March 26, 2021, finding that Hall only became disabled

on January 31, 2017, after the end of the prescribed period for her DWB application (February

28, 2014), such that she was entitled only to SSI from January 31, 2017 onwards.  (Tr. 12–31,

42–76).  In so ruling, the ALJ determined that Hall had the residual functional capacity ("RFC")

through January 31, 2017 to perform work at the light exertion level, except that:

> [Hall] could occasionally climb ramps and stairs, never climb ladders, ropes, or
> scaffolds, and occasionally stoop and crawl.  Further, she could frequently reach
> overhead.  She needed to avoid extreme temperatures and concentrated exposure
> to pulmonary irritants, such as dust, fumes, … odors, and gases, and vibration, as
> well as[] no exposure to unprotected heights, hazardous machinery, commercial
> driving, and direct sunlight, and no more than moderate noise level.  Additionally,
> [Hall] could perform simple, routine tasks with simple, short instructions, make
> simple decisions, have simple, occasional workplace changes, no fast pace

---

[1] Hall previously applied for disability insurance benefits in January 2011, with an alleged onset date of
March 23, 1999 and a last insured date of September 30, 2000.  That claim was denied on May 11, 2011.
Neither party disputes that the relevant period under adjudication is from February 9, 2007 to February
28, 2014 for Hall's DWB application and from November 4, 2016 to the date of the ALJ decision for her
SSI application.
[2] The administrative transcript appears in ECF Doc. 6.

production quotas, and have occasional and superficial interaction with the public and supervisors.

(Tr. 22).

On April 11, 2022, the Appeals Council declined further review, rendering the ALJ's decision on remand the final decision of the Commissioner.  (Tr. 6–8).  On June 6, 2022, Hall filed a complaint to obtain judicial review.  ECF Doc. 1.  On August 2, 2022, the parties consented to magistrate judge jurisdiction.  ECF Doc. 7; *see also* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Hall was born on December 25, 1963.  (Tr. 362, 369).  She was 35 years old on the alleged onset date, 50 years old at the end of the DWB prescribed period, and 53 years old on January 31, 2017.  Hall completed high school in 1982 and obtained a barber's license in 1985.  (Tr. 421).  Hall's work history included cashier, press operator, and chemical technician.  *Id.* However, the ALJ determined that Hall had no past relevant work.  (Tr. 29).

### B.    Relevant Medical Evidence

Hall's challenge to the ALJ's decision on remand is focused on the ALJ's evaluation of her treating physician's opinions on the limiting effects of Hall's migraines and seizures; thus, a summary of the medical and opinion evidence regarding Hall's other impairments is unnecessary.  *See generally* ECF Doc. 9; ECF Doc. 14.

Hall's medical history around the time of the alleged onset date included treatment for migraine headaches since 1994.  *See* (Tr. 1913, 1985–86, 1998–99, 2037–39, 2041–42, 2044, 2050, 2071, 2082–85, 2096, 2102, 2105).  Hall's reported symptoms included: (i) "blackouts"; (ii) blurred vision; (iii) dizziness; (iv) nausea; (v) pain; (vi) phonophobia; (vii) photophobia; and

(viii) vertigo.  *See* (Tr. 1971, 1999, 2002, 2033, 2037, 2041, 2044–45, 2048, 2050, 2075, 2096, 2105).  Hall rated her pain at 2-3/10 in severity on a daily basis and 5-6/10 in severity with any physical activity.  (Tr. 2002).  She also reported suffering 10/10 headache pain twice per week, lasting one to two days at a time, during which she would be bedridden.  (Tr. 2002, 2075); *see also* (Tr. 2085).  Image tests were remarkable for: (i) abnormal appearance in the deep white matter of the right parietal lobe; and (ii) chronic lacunar infarct and periventricular white matter extending into the right upper basal ganglia.  (Tr. 2076–77, 2081, 2103).  Hall treated her headache pain with various medications, none of which provided relief.  *See* (Tr. 2044, 2048, 2071, 2074–75, 2082–85, 2102).

Between 2000 and 2006, Hall reported to Pamela Lancaster, DO, that she had experienced blurred vision, dizziness, headaches, and stiffness in her back and neck.  *See* (Tr. 1951, 1953, 1970–74, 1977–78).  Dr. Lancaster diagnosed Hall with basilar migraines and prescribed Neurontin, Depakote, and Elavil.  (Tr. 1969, 1973, 1978).  By January 2007, Hall reported that she was not receiving formal treatment for her headaches, because: "It is my understanding that there is no formal treatments for me and that the damage is already done." (Tr. 1919).

On March 22, 2011, Hall visited Abdul Itani, MD, reporting neck pain rated at 3/10 in severity with paresthesia and radiation down her left upper extremity.  (Tr. 1753, 1755).  Hall reported that "all positions are uncomfortable."  (Tr. 1753).  Hall's physical examination results were remarkable for uncomfortable neck movement and absent triceps reflex.  *Id.*  Dr. Itani diagnosed Hall with cervicalgia and ordered x-ray and MRI testing.  (Tr. 1753–54).

On March 30, 2011, Hall returned to Dr. Itani to follow-up on the results of her imaging tests.  (Tr. 540).  According to Dr. Itani, Hall's x-ray testing results revealed some degeneration

of the C6-7 disc, and her MRI testing results showed no evidence of herniation or impingement of on the exiting nerve root.[3]  *Id.*  Dr. Itani recommended physical therapy.  *Id.*

On August 25, 2011, Hall visited the Ashtabula County Medical Center's emergency department, reporting blurred vision, headache pain rated at 6-10/10 in severity, nausea, and photophobia.  (Tr. 1792–93, 1798).  Hall stated that her pain had started three days earlier, when she "blacked out."  (Tr. 1793).  Hall's physical examination results were remarkable for moderately distressed appearance and tachycardia.  (Tr. 1793, 1799).  Hall was discharged with prescriptions for tramadol and antinausea medication.  (Tr. 1800).  Hall rated her pain on discharge at 9/10 in severity.  (Tr. 1794).

On October 23, 2011, Hall returned to the emergency department, reporting chest pain, blurred and double vision, headache pain rated at 5/10 in severity, nausea, neck stiffness, photophobia, and tiredness.  (Tr. 1804, 1807).  She reported that her symptoms started the night before.  (Tr 1804).  Hall's physical examination results were remarkable for moderately distressed appearance.  (Tr. 1804, 1810).  Hall rated her pain on discharge at 0/10 in severity. (Tr. 1805, 1810).

On February 6, 2012, Hall visited Dr. Lancaster, reporting coughing, headache, eye pain, and chest congestion.  (Tr. 2597).  Hall's physical examination results were remarkable for severe neck pain secondary to coughing and diminished crackles.  *Id.*  Dr. Lancaster diagnosed Hall with acute sinobronchitis and prescribed medication.  *Id.*

On June 10, 2013, Hall reported to Dr. Lancaster a painful rash on her left side.  (Tr. 2593).  Hall's physical examination results were remarkable for pain vesicles over her left lower

---

[3] Hall's actual x-ray and MRI test results are not part of the medical record.

quadrant and chronic pain in her back and extremities.  *Id.*  Dr. Lancaster diagnosed Hall with herpes with radicular pain and prescribed medication.  *Id.*

On August 12, 2013, Hall's mother called Dr. Lancaster's office to cancel Hall's appointment, because Hall "has been sick all weekend with a bad migraine [and] can not get up [to do] anything."  (Tr. 2591).  Dr. Lancaster advised Hall to call an ambulance if the pain was as bad as described.  *Id.*

On August 14, 2013, Hall reported to Dr. Lancaster cough, congestion, earache, ear ringing, and neck and shoulder pain.  (Tr. 2590).  Hall's physical examination results were remarkable for anterior cervical nodes, red nasal mucosa, diffuse erythema and discharge of the throat, and loose rhonchi.  *Id.*  Dr. Lancaster diagnosed Hall with bronchitis/sinusitis and prescribed medication.  *Id.*

On March 25, 2014, Hall reported to Dr. Lancaster sinus drainage and white cough.  (Tr. 2589).  Her physical examination results were remarkable for enlarged glands, tender anterior nodes, swollen nose, throat erythema and drainage, and wheezing.  *Id.*  Dr. Lancaster diagnosed Hall with acute bronchitis, diabetes, and hyperlipidemia and prescribed medication.  *Id.*

On May 28, 2014, Hall reported to Dr. Lancaster that she'd had sinus drainage, productive cough, and chronic headaches for two months.  (Tr. 2586).  Her physical examination results were remarkable for anterior cervical nodes, drainage, redness and swelling, and sad affect and mood.  (Tr. 2587).  Dr. Lancaster diagnosed Hall with postnasal discharge, cough, and endogenous depression and prescribed medication, including Depakote.  (Tr. 2588).

On October 20, 2014, Hall reported to Dr. Lancaster sinus drainage and chest congestion.  (Tr. 2582).  Hall's physical examination results were remarkable for posterior drainage and erythema.  (Tr. 2584).  Dr. Lancaster adjusted Hall's medication.  (Tr. 2585–86).

On January 6, 2015, Hall reported to Dr. Lancaster sinus drainage, yellow cough, chest congestion, and sudden onset of severe occipital headache. (Tr. 2578). Hall reported that she'd been continuously sick since November, had her teeth pulled, and was "chronically disabled with her headaches and seizures." *Id*. Hall further reported that her "[h]eadache proceeds to seizure like activity and is bed confined intermittently for years." *Id*. Hall's physical examination results were unremarkable. (Tr. 2580). Dr. Lancaster diagnosed Hall with chronic obstructive pulmonary disorder ("COPD") with acute bronchitis. *Id.*

On February 24, 2015, Hall reported to Dr. Lancaster sinus drainage, white cough, and upper back and shoulder pain. (Tr. 2574). She also reported headache pain rated at 7/10 in severity, which was worse with coughs. *Id*. Hall reported that her headache episodes "started about 5 years ago, each episode lasting about 5 years [*sic*]." *Id*. Hall's physical examination results were remarkable for being acutely ill, uncomfortable, and appearing exhausted, and having mild respiratory distress. (Tr. 2576). Dr. Lancaster diagnosed Hall with COPD and prescribed medication. (Tr. 2576–77).

On March 21, 2015, Hall visited University Hospitals' emergency department, reporting headache pain going on for four to five days. (Tr. 1457). Hall rated her pain 3/10 in severity. *Id.* Hall's physical examination results were unremarkable. (Tr. 1458). The attending physician diagnosed Hall with acute cephalgia and acute sinusitis, noting that Hall's headache pain was only "minimal." *Id.* Hall refused medication for her headache pain. *Id.*

On February 19, 2016, Hall visited Dr. Lancaster to complete disability paperwork. (Tr. 902). Hall reported no adverse symptoms. (Tr. 902–03).

On October 28, 2016, Hall reported to Dr. Lancaster pain in her foot, thumbs, and toe following a fall. (Tr. 2260). She reported that she was taking Tylenol for "a bad headache."

(Tr. 2260–61).  Hall's physical examination results were remarkable for bruised toes and a sebaceous cyst in her back.  (Tr. 2263–64).

On November 29, 2016, Hall visited the Ashtabula County Medical Center's emergency department, reporting headache pain rated at 10/10 in severity that was exacerbated by light and sound.  (Tr. 519).  Hall reported associated symptoms of vertigo and photophobia.  (Tr. 520). Hall's physical examination results were unremarkable.  (Tr. 520–21).  Hall received a dihydroergotamine injection, Dilaudid, and Zofran, after which her pain subsided to 4/10 in severity.  (Tr. 521).  Hall refused further medication treatment and was discharged.  *Id.*

Hall also visited Stephen Selkirk, MD, for a neurology consultation.  (Tr. 521–22).  Hall reported experiencing headaches two to three times per week, which were usually preceded by seizures.  (Tr. 522).  Hall described the headaches as lasting 24 hours, during which she would become unsteady and confused.  *Id.*  She further reported that she spent the headache period in bed for two to three days.  *Id.*  She reported that she did not take any medication for her headaches, noting that all her past treatment had been ineffective.  *Id.*  Hall's physical examination results were unremarkable.  (Tr. 523).  Dr. Selkirk prescribed Inderal and Relpax, stating that Hall's clinical presentation was not consistent with a seizure.  *Id.*

### C.    Relevant Opinion Evidence

#### 1.    Treating Source - Pamela Lancaster, DO

Between 1992 and 2018, Dr. Lancaster issued 26 opinions on Hall's physical functional limitations: (i) 14 that were issued before the adjudication period (Tr. 1989–91, 1993–97, 2200–21, 2184–99); (ii) 7 that were issued during that period (Tr. 2161–62, 2166–73, 2180–83); and (ii) 5 that were issued after the adjudication period (Tr. 1723–24, 2157, 2174–77, 2372).  Those most relevant to Hall's challenge to the ALJ's decision were the ones issued during the

prescribed period, which were expressed as answers to two-page checklist questionnaire forms related to long-term disability benefits that Hall had received from her life insurance carrier.

In April 2008 and August 2009, Dr. Lancaster did not assign any specific limitations; rather, Dr. Lancaster opined that Hall was "unable to function" with headaches and would be disabled two to three days out of the week, two to three weeks per month.  (Tr. 2180–83). Dr. Lancaster opined that Hall's cognitive function and her vision would be impaired by her diagnoses of partial complex seizures with headaches and basilar migraines.  (Tr. 2181, 2183).

In November 2010 and December 2011, Dr. Lancaster opined that Hall could never lift or carry weight or reach.  (Tr. 2161–62, 2166–67).  Dr. Lancaster did not assign limitations to Hall's ability to sit, stand, or walk, stating: "H.A. in bed for days."  (Tr. 2162, 2167).

On February 24, 2012, Dr. Lancaster opined that Hall could not lift any weight.  (Tr. 2168).  Dr. Lancaster did not assign any manipulative or postural limitations and did not assign limitations to Hall's ability to sit, stand, or walk.  (Tr. 2168–69).  In the additional comments portion of the form, Dr. Lancaster stated: "Partial Complex Seizures, Basilar Migraines, muscle pain, HA, spasms of the cervical spine, syncope, NIDDM."  (Tr. 2169).

On March 28, 2012, Dr. Lancaster opined that Hall could: (i) lift up to ten pounds occasionally; (ii) occasionally crawl, crouch, drive, kneel, and stoop; (iii) occasionally feel, finger, handle, and reach; and (iv) never climb or balance.  (Tr. 2170–70).  Dr. Lancaster further opined that Hall had environmental limitations, indicating that "strong smells, loud sounds can cause migraines."  (Tr. 2171).  In the additional comments portion of the form, Dr. Lancaster stated: "pt. has partial complex seizures, basilar migraines, spasms of cervical spine – during any of these problems pt. unable to work."  *Id.*

On August 14, 2013, Dr. Lancaster opined that Hall could: (i) sit, stand, and walk for 30 minutes at a time and for up to 180 minutes in a workday; (ii) occasionally lift up to 10 pounds; and (iii) finger and handle without limitation.  (Tr. 2173).  Dr. Lancaster circled responses indicating that Lancaster both could never reach but also do so occasionally.  *Id.*  On January 6, 2015, Dr. Lancaster opined that Hall was "unable" to perform any exertional, manipulative, or postural activities.  (Tr. 2173–74).

### 2.      State Agency Consultants

On February 15, 2017, Elizabeth Das, MD, evaluated Hall's physical capacity as it related to her DWB claim based on a review of the medical record.  (Tr. 140–42).  Dr. Das determined that Hall could: (i) lift/carry 20 pounds occasionally and 10 pounds frequently; (ii) sit, stand, and walk up to 6 hours in an 8-hour workday; and (iii) occasionally crawl, stoop, and climb ladders, ropes, and scaffolds.  (Tr. 140–41).  In explaining Hall's limitations, Dr. Das said only: "h/o cervical spine fusion" and "moderate persistent asthma."  (Tr. 141–42).

On August 14, 2017, Teresita Cruz, MD, concurred in part with Dr. Das's opinion.  (Tr. 174–76).  But in light of newly received evidence, Dr. Cruz additionally found that Hall could never climb ladders, ropes, and scaffolds.  (Tr. 175).  Dr. Cruz explained that that her additional findings were due to dizziness and light-headedness.  (Tr. 175–76).  Dr. Cruz further explained that: (i) although Hall had a history of stroke, there were no function deficits; and (ii) Hall had some back pain and low pulse oxygen on some physical examinations due to asthma.  *Id.*

### D.      Relevant Testimonial Evidence

Hall's testimony at the 2018 and 2020 administrative hearings was largely limited to her condition at the time of the administrative hearings.  However, Hall's challenge to the ALJ decision concerns the denial of DWB benefits, the period under adjudication of which ranges

from February 9, 2007 to February 28, 2014.  Thus, a summary of Hall's administrative hearing testimony is omitted.

At the 2018 administrative hearing, vocational expert ("VE") Paula Zinsmeister testified that an individual person with the ALJ's proposed hypothetical limitations could perform work at the light exertion level as a merchandise marker, cleaner, mail clerk, and routing clerk.  (Tr. 107–09).  If the individual exhibited off-task behavior 20% of the workday, the VE testified the individual could not work.  (Tr. 109–10)

At the 2020 administrative hearing, VE Gene Burkhammer testified that an individual with the ALJ's proposed hypothetical limitations could perform work at light exertion level as a mail clerk, garment sorter, and office helper.  (Tr. 71–73).  If the individual were absent three times per month on a "fairly ongoing basis," the VE testified that the individual would be precluded from all work.  (Tr. 73–74).

## III.    Law & Analysis

### A.    Standard of Review

The court's review of the Commissioner's final decision denying disability benefits is limited to deciding "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009).  Substantial evidence exists "if a reasonable mind might accept the relevant evidence as adequate to support a conclusion," *Id.* at 406 (internal quotation marks omitted), even if a preponderance of the evidence might support the opposite conclusion. *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020).  However, the ALJ's decision will not be upheld when the ALJ failed to apply proper legal standards and the legal error prejudiced the claimant.  *Rabbers v. Comm'r SSA*, 582 F.3d 647, 654 (6th Cir. 2009).  Nor

will the court uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotation marks omitted).

### B.      Step Four – Opinion Evidence

Hall argues that the ALJ failed to apply proper legal standards in the ALJ's evaluation of Dr. Lancaster's opinions from within the prescribed period.  Hall argues that the ALJ erred when she failed to articulate how she considered the regulatory factors relevant to the weight due to a treating source opinion when the opinion is not given controlling weight.  ECF Doc. 9 at 19. Hall argues that the ALJ also erred when she applied greater scrutiny to Dr. Lancaster's opinions than to those of the state agency consultants, who, like Dr. Lancaster, gave "sparse reasoning" to support their findings yet were nevertheless credited over Dr. Lancaster.  ECF Doc. 9 at 20.  And Hall argues that the ALJ's errors prejudiced her because Dr. Lancaster's findings would have resulted in findings of disability at least as of December 25, 2013.  ECF Doc. 9 at 20–21.  The Commissioner disagrees.  ECF Doc. 11 at 9–12.

The regulations in place at the time Hall filed her applications required the ALJ to consider and assign weight to every medical opinion in the record.  20 C.F.R. § 404.1527(c).  If the opinion comes from a treating source, the ALJ must give it controlling weight so long as it was supported by clinical and laboratory diagnostic evidence and not inconsistent with other substantial evidence in the record.  20 C.F.R. § 404.1527(c)(2).  If the ALJ does not give the treating source's opinion controlling weight, she must determine the weight it is due by considering several factors.  *Id.*  And the ALJ must provide "good reasons" for the weight assigned to the treating source's opinion if she does not give it controlling weight.  *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 785 (6th Cir. 2017).

12

Hall has not established that the ALJ failed to apply proper legal standards in the ALJ's handling of Dr. Lancaster's opinions from within the prescribed period.  42 U.S.C. 405(g); *Blakley*, 581 F.3d at 405.  The ALJ complied with the regulations when she: (i) acknowledged that Dr. Lancaster was a treating source; (ii) grouped Dr. Lancaster's opinions together; and (iii) stated that they were assigned "no weight."  20 C.F.R. § 404.1520c(b)(1); 20 C.F.R. § 404.1527(c), (f)(2); (Tr. 27–28).  And the ALJ provided sufficiently clear reasons for the weight given when she stated:

> While Dr. Lancaster was a treating physician through the period at issue, the undersigned finds the limits opined on those forms are not well supported. Despite the significant restrictions opined in all those forms, Dr. Lancaster provided very sparse explanation in rendering her opinion.  Overall, Dr. Lancaster cursorily noted migraines and an inability to function without explaining the medical basis.  As such, the undersigned accords little weight to those opinions.

(Tr. 27–28).

Contrary to Hall's argument, the ALJ was not required bifurcate her controlling weight and deferential weight analyses.  *Swartz v. Comm'r of Soc. Sec.*, 5:14 CV 2723, 2016 U.S. Dist. LEXIS 15706, at *18 (N.D. Ohio Feb. 9, 2016); *see also, e.g.*, *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009); *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877 (6th Cir. 2007); *Bledsoe v. Barnhart*, 165 F. App'x 408, 412 (6th Cir. 2006).  The ALJ was not required to articulate how she considered each of the regulatory factors so long she articulated "good reasons" for the weight given.  *Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011).  And although the ALJ only discounted Dr. Lancaster's opinions for lack of supportability, lack of supportability is a "good reason" which can serve as an independent basis for giving a treating source opinion less than controlling weight.  20 C.F.R. § 404.1527(c)(2); *Dockey v. Comm'r of Soc. Sec.*, 1:20-cv-153, 2021 U.S. Dist. LEXIS 62240, at *12 (W.D. Mich. Mar. 31, 2021); *Grider v. Comm'r of Soc. Sec.*, No. 2:10-cv-00083, 2011 U.S. Dist. LEXIS

31540, at *35 (S.D. Ohio Jan. 11, 2011), *report and recommendation adopted*, 2011 U.S. Dist. LEXIS 31529 (S.D. Ohio Mar. 25, 2011).

Hall's remaining argument is unavailing. An ALJ is precluded from giving "more rigorous scrutiny of the treating source opinion than the nontreating and nonexamining opinions." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013). The reason why is because that's the opposite of what the regulations command. *Id.* But that's not what happened here. A commonsense reading of the ALJ's decision, in conjunction with the opinion evidence, sheds light on the difference between the supportability of Dr. Lancaster's opinions and those of the state agency consultants. *Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–79 (7th Cir. 2010) As the ALJ noted, the opinion of the state agency consultants was based on a review of the medical record, i.e., the basis from which they made their opinions can be readily discerned. (Tr. 26). By contrast, Dr. Lancaster's opinions stand alone, without any indication of the basis for the limitations expressed therein aside form Hall's bare diagnoses. The ALJ did not, therefore, apply greater scrutiny to Dr. Lancaster than to the state agency consultants.

Moreover, any error in the ALJ's handling of Dr. Lancaster's opinions from within the prescribed period was harmless. *Rabbers*, 582 F.3d at 654. A procedural error in the ALJ's application of the treating physician rule can be harmless if the opinion is "so patently deficient" that the Commissioner could not possibly credit it. *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 474 (6th Cir. 2016). The Sixth Circuit has found physician opinions "patently deficient" when they involve a "check-box analysis … not accompanied by any explanation" beyond mere diagnoses. *Id.* at 474–75. That is exactly how Dr. Lancaster expressed her opinions.

Thus, the court finds no basis for remand on account of Hall's challenge to the ALJ's handling of Dr. Lancaster's opinions from within the prescribed period.

### C.  Step Four – Cherry-Picking

Hall argues that the ALJ engaged in improper "cherry-picking" when the ALJ rejected Dr. Lancaster's pre-adjudicatory period opinions as temporally irrelevant yet contrasted two post-adjudicatory period opinions to discount Hall's subjective symptom complaints. ECF Doc. 9 at 21–22.  The Commissioner disagrees.  ECF Doc. 11 at 16–18.

Hall has not established that the ALJ failed to apply proper legal standards in the ALJ's evaluation of Dr. Lancaster's opinions from before the prescribed period. 42 U.S.C. 405(g); *Blakley*, 581 F.3d at 405.  Hall has not disputed that Dr. Lancaster's opinions fell outside the period under adjudication relevant to her DWB claim.  The remoteness of Dr. Lancaster's opinions from before the prescribed period was an acceptable basis upon which to discount them. *See Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 849–50 (6th Cir. 2020) (stating that an ALJ is only required to consider a treating source opinion to the extent the opinion reflects the claimant's limitations during the period under adjudication).

Hall's claims that the ALJ engaged in cherry-picking fall short.  Cherry-picking occurs when the "ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability."  *Nathaniel F. v. Comm'r of Soc. Sec.*, No. 2:20-cv-5364, 2022 U.S. Dist. LEXIS 24644, at *24 (S.D. Ohio Feb. 11, 2022) (citing *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014)).  Hall has not argued that the ALJ failed to acknowledge evidence supporting a finding of disability; rather, she argues that the ALJ erred by using the remoteness unevenly, against giving weight to Dr. Lancaster's opinions but not against the weight of

assertions in the record that Hall misrepresented her functioning in 2006.  The issue of whether the ALJ cherry-picked evidence is, therefore, not before the court.  *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009) ("the same process can be described more neutrally as weighing the evidence").  And other than her cherry-picking argument, Hall has not articulated in what way the ALJ's handling of the two sets of evidence was error.  *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997).[4]

Thus, the court finds no basis for remand on account of Hall's challenge to the ALJ's handling of the opinion evidence from before – or after – the prescribed period.

## IV.    Conclusion

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Hall's applications for DWB and SSI is affirmed.

**IT IS SO ORDERED.**

Dated: March 14, 2023

Thomas M. Parker
United States Magistrate Judge

---

[4] Moreover, it was not unreasonable for the ALJ to find investigation notes reporting on Hall's functioning up to 8 months before the prescribed period more relevant than opinions issued between 15 years (at most) and 16 months (at least) before the prescribed period.